IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAJAN KNUCKLES, <br> 820 West Marietta St. NW 1316, <br> Atlanta, GA 30318 <br> <br> Plaintiff, <br> <br> v. <br> <br> FEDERAL DEPOSIT INSURANCE <br> CORPORATION, <br> 550 17th Street, NW, <br> Washington, DC 20429-9990 <br> <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) Case No.: <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT
(Jury Trial Demanded)

COMES NOW, Plaintiff Dajan Knuckles (hereinafter "Plaintiff"), by and through undersigned counsel, and files this her *Complaint* for damages against Defendant Federal Deposit Insurance Corporation (hereinafter "Defendant" or "FDIC") and for cause would show unto the Court the following:

### PARTIES

1. Plaintiff is an adult resident of the Atlanta, Georgia.

2. Defendant is an independent agency created by congress registered to do business in the District of Columbia.

### JURSIDCITION AND VENUE

3. This is a suit to obtain relief for race discrimination under Title VII of the Civil Rights Act of 1964, as amended.

4. Plaintiff further seeks to obtain relief under the Americans with Disabilities Act (ADA).

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(4) and 28 U.S.C. § 2202.

6. Venue is proper in that the alleged acts occurred in the District of Columbia.

## ADMINISTRATIVE REMEDIES

7. Plaintiff filed with the United States Equal Employment Opportunity Commission ("EEOC") a charge of discrimination against Defendant.

8. The EEOC issued a Dismissal and Notice of Rights ("Right to Sue Letter").

9. Plaintiff initiated this action within 90 days of the mailed date.

10. All conditions precedent to the institution of this lawsuit have been fulfilled.

## FACTUAL ALLEGATIONS

11. Plaintiff was employed under the Corporate Employee Program as a Financial Institution Specialist in September 2015.

12. Plaintiff's position was a CG 7/9/11/12 promotional track without competition.

13. Employees in Plaintiff's position were afforded four years of training to take a commission test that would allow them to be promoted to the CG 11 grade which would automatically become CG 12 after a one year as a CG 11.

14. The commissioning exam requires no specific passing score.

15. There is unwritten expectation that regional offices have a passing score of 75 is required.

16. There is discretionary flexibility to this score s some field supervisor (FS) will promote with a score of less than 70.

17. Plaintiff was very proactive in her training and requests.

18. In March 2017, Plaintiff's FS, Darla Walker (a white woman) began subjecting Plaintiff to disparate treatment.

19. The FS placed parameters around Plaintiff's employments that were different than white employees that started the same day, in the same position, and same grade as Plaintiff.

20. As a result of these parameters, Plaintiff's promotions were delayed by five months whereas her similarly situated white employees were promoted on time.

21. The FS placed individual policies on Plaintiff that were not enforced on similarly situated white employees.

22. Plaintiff was diagnosed with deep vein thrombosis (DVT) which required Plaintiff to seek regular medical treatment.

23. Plaintiff requested a reasonable accommodation to have her schedule allow her to attend her medical treatments.

24. The FS refused to allow Plaintiff time to attend her medical treatments without having Plaintiff disclose private and personal medical information first.

25. When Plaintiff informed the FS that it was inappropriate to require her to disclose her personal and private medical information, the FS replied that she could request any information that she wanted to validate time and attendance.

26. No similarly situated white employees were subjected to the same policy.

27. To further harass Plaintiff, the FS denied Plaintiff's request to attend her nephew's funeral and threatened to note her as AWOL.

28. It took Plaintiff's union to address the issue for the FS to allow Plaintiff to attend the funeral.

29. Additionally, the FS notified the finance department that she did not believe that Plaintiff was utilizing her travel vouchers correctly.

30. The finance department questioned the validity of the FS's reports given that all vouchers had been approved by the FS.

31. However, because of the FS's position, the finance department placed Plaintiff on alert and blocked Plaintiff's travel payments.

32. The FS further increased Plaintiff's mandatory traveling.

33. As a result, Plaintiff was forced to pay out of pocket for all her mandatory traveling.

34. Plaintiff was required to drain her savings to cover the cost of her mandatory work traveling.

35. Plaintiff was further investigated and audited by the finance department for all receipts from the previous year.

36. The investigation resulted in the finance department determining that the FS's report was unfounded and that she had been underpaid by FDIC.

37. No similarly situated white employees were subjected to this treatment.

38. The FS actions were done to further harass Plaintiff because of her race.

39. During Plaintiff's acting examiner in charge role, the FS placed Plaintiff in a large bank despite her lack of experience.

40. Plaintiff's supervisory examiner (SE) Andrew Ames reported that Plaintiff was extremely smart and competent.

41. The bank emailed Plaintiff to notify her that she was doing an amazing job on site.

42. However, on her evaluations by the FS she inexplicably received three areas of "needs improvement."

43. No similarly situated white employees were subjected to such treatment.

44. The FS actions were done to further harass Plaintiff because of her race.

45. When it was time for Plaintiff to begin preparing for her exam, the FS gave priority to the two white pre-commission examiners that she hired after Plaintiff.

46. Because of Plaintiff's hiring date, she should have had priority but was wrongfully denied.

47. The FS gave the two white examiners more training time and more time to study new sections.

48. The FS gave Plaintiff less training time and less time to study.

49. The FS further continuously added additional duties to Plaintiff while she was supposed to be preparing for the exam.

50. As a result, Plaintiff failed the exam.

51. Normally, employees are allowed three opportunities to take the exam.

52. Plaintiff was only allowed one opportunity to take the exam.

53. After Plaintiff filed her EEO complaint, she was approached by Assistant Regional Director (ARD) Gary Finnegan.

54. ARD is the FS's supervisor.

55. ARD informed Plaintiff that she would not be provided three opportunities to take the exam and she could either quit or be terminated.

56. Plaintiff informed ARD that she had accepted a new position and that she would be transferring out of the agency in 3 weeks.

57. ARD then informed Plaintiff that she could not stay at FDIC until the transfer was completed.

58. ARD later called Plaintiff and informed her that if dropped the EEO complaint, she could stay at the agency until her transfer was complete.

59. Plaintiff declined to drop her EEO complaint.

60. As a result, she was forced to leave the agency.

61. Additionally, the transferring agency rescinded Plaintiff's employment after speaking with FDIC.

62. Plaintiff was thus unemployed because of FDIC's actions for 8 months.

63. As a result of FDIC, and its employees, actions, Plaintiff was forced to seek medical attention and was prescribed medication for anxiety and stress.

64. FDIC not only discriminated against Plaintiff because of her race, but further denied her reasonable accommodations and retaliated against her for filing an EEO complaint.

## COUNT I: RACE DISCRIMINATION – DISPARATE TREATMENT

65. Plaintiff adopts the above facts in support of this Count.

66. Plaintiff brings this claim under Title VII of the Civil Rights Act of 1964, as amended against Defendant District of Columbia.

67. Plaintiff alleges Defendant violated Title VII because Plaintiff was repeatedly denied promotions by his supervisors at the Agency.

68. Instead, Defendant repeatedly promoted similarly situated employees who were not African American. These similarly situated employees had less experience as Plaintiff.

69. Specifically, Plaintiff's supervisor intentionally implemented policies against Plaintiff that were not enforced against similarly situated white employees.

70. Additionally, Plaintiff's supervisor intentionally allowed similarly situated white employees to have more time to train and study and more opportunities to take the required exam than Plaintiff.

71. As a result, Plaintiff was not promoted, not able to pass the exam, and was subsequently terminated from her position.

72. Such unlawful employment practice proximately caused Plaintiff to suffer economic damages.

73. Defendant is liable for its discriminatory conduct to which it subjected Plaintiff.

## COUNT II; DISABILITY DISCRIMINATION

74. Plaintiff adopts the above facts in support of this Count.

75. Plaintiff brings this claim under the ADA.

76. Plaintiff alleges that Defendant denied Plaintiff reasonable accommodations under the ADA.

77. Specifically, Plaintiff notified Defendant, through its employees, that she suffered from a qualified disability, DVT.

78. Plaintiff requested that her schedule allow her to attend regularly scheduled medical treatments.

79. The FS denied Plaintiff's request and informed her that she would not be able to attend her treatments without disclosing personal and private medical information.

80. Defendant did not inform or notify Plaintiff whether her requests caused under hardship.

81. Such unlawful employment practice proximately caused Plaintiff to suffer economic damages.

82. Defendant is liable for its discriminatory conduct to which it subjected Plaintiff.

## COUNT III; RETALIATION

1. Plaintiff adopts the above facts in support of this Count.

2. Plaintiff brings this claim under Title VII of the Civil Rights Act of 1964, as amended against Defendant District of Columbia.

3. Plaintiff alleges that Defendant retaliated against Plaintiff for participating in a protected activity.

4. Specifically, Plaintiff filed an EEO complaint.

5. After failing the required examination, Plaintiff was denied an opportunity to retest which is allowed by FDIC policy.

6. Plaintiff was told by a senior employee that if she could either quit or be terminated.

7. Plaintiff was informed that if she withdrew her EEO complaint, she could remain with FDIC until her transfer to another agency was complete.

8. Because Plaintiff declined to withdraw her EEO complaint, she was terminated the Defendant caused her new employer to withdraw is employment offer.

9. Such unlawful employment practice proximately caused Plaintiff to suffer economic damages.

10. Defendant is liable for retaliatory conduct to which it subjected Plaintiff.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests the entry of judgment against Defendant pursuant to an Order awarding:

   a. Compensatory damages to be determined by the trier of fact.

   b. Nominal damages to be determined by the trier of fact.

   c. Punitive damages to be determined by the trier of fact.

   d. Declaratory and injunctive relief.

   e. That relief, which is fair, just, and equitable under the circumstances of this case.

JURY TRIAL DEMANDED

Respectfully submitted,

<u>/s/ Charles Tucker, Jr.</u>
Charles Tucker, Jr.
Tucker Moore Group
8181 Professional Place, Suite 207
Hyattsville, MD 20785
Phone: 301-577-1175
Email: Charles@tuckerlawgroupllp.com
ATTORNEY FOR PLAINTIFF
